## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARITY HENDRICKSON, | CASE NO. 1:13-cv-02384-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | |
| | Docs. 1, 8, 9, 16, 20, 25 |

## I.      Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Charity Hendrickson for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff asserts disability in part because of fibromyalgia and a difficult to diagnose immune system disease. She had been treated for her immune system dysfunction by a specialist, Dr. Schulz, for a year prior to the ALJ decision. Dr. Schulz opined that Plaintiff's impairments were causing incapacitating joint inflammation. Plaintiff asserts that the ALJ erred in rejecting Dr. Schulz's opinion, the only medical opinion in the record. The ALJ rejected Dr. Schultz's opinion because: (1) it was

supposedly  based on subjective complaints, without support from (a) objective findings and (b) diagnostic testing and (2) it was on the ultimate issue of disability, which is reserved to the Commissioner. However, in concluding that the opinion was unsupported by objective medical evidence, the ALJ failed to mention multiple (a) objective findings and (b) diagnostic tests that corroborate Dr. Schulz's opinion and contradict the ALJ's conclusion. The ALJ made a factual error, concluding that Plaintiff did not see Dr. Schulz in February of 2012 despite clear evidence that she was seen for an office visit.   The ALJ also refused to obtain an opinion from a state agency physician. No person with medical training opined that Plaintiff's objective findings were normal or mild. Thus, the ALJ's characterization of the objective findings as "normal" or "mild" constitutes impermissible lay interpretation of medical evidence.

Even if the ALJ had properly concluded that objective findings failed to support Dr. Schultz's opinion, objective findings are not required, particularly for impairments such as those alleged by the Plaintiff, which often manifest with few objective signs. Moreover, relying on subjective statements only undermines Dr. Schulz's opinion if those statements were not credible. Here, the ALJ concluded that Plaintiff was not credible because the objective evidence did not support her claims. The ALJ also concluded that Plaintiff's treatment was conservative, without using any medical opinion to support this characterization. The ALJ has no

medical training, so both of these rationales constitute impermissible lay interpretation of medical evidence. The ALJ also found that Plaintiff's activities prior to her deterioration in the spring and summer of 2011 contradicted her testimony in spring of 2012. However, the ALJ may not rely on sporadic and transitory activities, and the medical record supports Plaintiff's claims that her symptoms became increasingly severe in the spring and summer of 2011. A claimant's subjective claims must be seriously considered by the ALJ, and the ALJ did not provide any legitimate basis to find Plaintiff's claims to be not credible.

Finally, assuming the ALJ properly concluded that Dr. Schulz's opinion was on an issue of ultimate disability reserved to the Commissioner, the ALJ should have recontacted Dr. Schulz, considering there was no other medical opinion in the record, rather than rejecting it on this ground. The ALJ did not provide any other reason for discounting Dr. Schulz's opinion. Without contradictory medical opinion evidence or specific, legitimate reasons to discredit Dr. Schulz's opinion, the record is insufficient for any reasonable person to accept the relevant evidence as adequate to conclude that, despite Dr. Schulz's opinion, Plaintiff can engage in work in the national economy. The ALJ has failed to meet his burden at step five, and the Court recommends that this case be remanded for further proceedings.

## II.   Procedural Background

On April 15, 2011, Plaintiff filed an application for SSI under Title XVI of

the Act. (Tr. 88-98). On May 17, 2011, the Bureau of Disability Determination denied this application (Tr. 62-68), and Plaintiff filed a request for a hearing on June 8, 2011.  (Tr. 74). On February 17, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 25-61).  On April 13, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 7-24). Plaintiff filed a request for review with the Appeals Council, which the Appeals Council denied on July 15, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On September 16, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On December 10, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 8, 9). On April 25, 2013, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 16). On April 30, 2014, the Court referred this case to the undersigned Magistrate Judge. On June 27, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 20). On September 10, 2014, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 25).

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Johnson v. Commissioner of

Social Sec., 529 F.3d 198, 200 (3d Cir. 2008); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). In other words, substantial evidence is "less than a preponderance" and requires only "more than a mere scintilla." Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs., 48 F.3d 114, 117 (3d Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).

## IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a

specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. <u>See</u> 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on September 29, 1990 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 34).   She has at least a high school education and no past relevant work. (Tr. 40).

Through 2009 and early 2010, Plaintiff reported "shaking" and anxiety, but reported that Effexor helped her symptoms. (Tr. 277-280, 282-86, 288-90, 406-18). A routine physical on January 19, 2010 indicated no major symptoms. (Tr. 288-90). Between May 2009 and August 2010, Plaintiff's weight increased from 164 pounds to 210 pounds. (Tr. 277, 283, 288, 358).

In March of 2010, Plaintiff reported to her primary care physician, Dr. Michael Kordek, M.D., that she was experiencing aches that had increased over the past year and spread to her arms. (Tr. 293, 302, 304). She would later explain that she began experiencing pain at age eleven. (Tr. 486, 642). At first, she reported increased pain with sports like soccer and basketball, but tests for exercise induced compartment syndrome were negative. (Tr. 487, 642). Further testing ruled out poplitieal artery entrapment. (Tr. 487, 642). Plaintiff began to refrain from exertional sports, and quit soccer when the coaches made her sit out due to pain.

(Tr. 357).  The pain never completely went away and always had pain in her legs with long walks, climbing stairs or exertional physical activity. (Tr. 487, 642).

There was nothing visibly wrong, so her primary care physician, Dr. Kordek, ordered diagnostic tests and referred her to a rheumatologist. (Tr. 293, 302, 304). On March 8, 2010, Dr. Kordek wrote a letter to Plaintiff that stated "[a] few of the inflammatory studies are minimally elevated. Be sure to see the rheumatologist." (Tr. 302). On March 10, 2010, Plaintiff reported more pain, so Dr. Kordek ordered additional tests. (Tr. 304). On March 11, 2010, she had an abnormal CBC differential test. (Tr. 311). She also had an abnormal HEP Function Panel, with low bilirubin. (Tr. 312). Her sedimentation rate ("ESR") was abnormally high.[1] (Tr. 312). Her CRP High Sensitivity test was also high. (Tr. 313).

On March 24, 2010, Dr. Bishwal, a rheumatologist, evaluated Plaintiff. She had a normal exam but her tests indicated elevated sedimentation rates, so he ordered more tests and referred her to a neurologist. (Tr. 311-17). Plaintiff had additional abnormal tests on March 25, 2010, with an abnormal CBC differential,

---

[1] As another Court in this District has explained, "[a]ccording to the Mayo Clinic's website the '[s]ed rate, or erythrocyte sedimentation rate (ESR), is a blood test that can reveal inflammatory activity in your body. A sed rate test isn't a stand-alone diagnostic tool, but the result of a sed rate test may help your doctor diagnose or monitor an inflammatory disease.'" Stephens v. Astrue, No. 4:11-CV-00005, 2012 WL 682994, at *5 (M.D. Pa. Mar. 2, 2012)( quoting Sed rate (erythrocyte sedimentation rate), Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/sed-rate/MY00343 (Last accessed February 29, 2012)).

with low hemoglobin[2] and low hematocrit, an abnormal metabolic panel, with low bilirubin, and an abnormal urinalysis, with abnormal protein, esterase, and bacteria. (Tr. 506-07, 517). She reported to Dr. Kordek on April 6, 2010, that her pain was getting worse. He noted that she had exhausted her primary care options, and would try to get an earlier neurology appointment. (Tr. 326).

On April 8, 2010, Plaintiff was evaluated by Dr. Friedenberg, a neurologist. She had an antalgic gait and "severe-limiting" myalgias. (Tr. 642). However, she could deep knee bend and hop on one foot easily. (Tr. 643). Dr. Friedenberg assessed her to have myalgias and indicated that the concern was "for metabolic myopathy." (Tr. 643). He noted "unclear how to connect this (if can be) with [questionable] childhood myalgias and leukemia not treated." (Tr. 643). He ordered an EMG, and when the EMG indicated mild myopathic abnormalities, ordered a muscle biopsy. (Tr. 189, 332).

Over the next several months, while waiting for the results of the muscle biopsy, Plaintiff was treated with narcotics and physical therapy. On June 4, 2010, she reported that the narcotics were helping but that her symptoms were not improving, and she exhibited additional weight gain and tearfulness. (Tr. 193). On June 17, 2010, a physical therapy evaluation noted multiple objective findings,

---

[2] "Signs and symptoms" of low hemoglobin include: "[f]aster than normal heartbeat during exercise or activity, [f]atigue, [f]eeling short of breath, [l]ack of energy during your usual activities, [p]ale skin and gums." Low hemoglobin count, When to See a Doctor, Mayo Clinic staff, http://www.mayoclinic.org/symptoms/low-hemoglobin/basics/when-to-see-doctor/sym-20050760 (Last accessed November 18, 2014).

including decreased strength, difficulty ambulating, and postural problems. Plaintiff's goals included increasing her walking and standing tolerances to thirty minutes and increasing her lower extremity strength from 4/5 to 4+/5. (Tr. 204).[3] On July 2, 2010, Plaintiff reported that she had persistent, yet better, symptoms, and that MS Contin and Neurontin helps. (Tr. 205). She reported she was "up and about more." (Tr. 205). She reported that she did well in school and made the Dean's List. (Tr. 205). Dr. Friedenberg noted that the etiology of Plaintiff's myalgias was still "unclear," and increased her MS Contin dosage. (Tr. 205). On July 15, 2010, Plaintiff had an evaluation for her biopsy, and objective findings include decreased strength and an "extremely antalgic" gait. (Tr. 211-213, 222).

In August of 2010, she wanted to begin weaning herself off her medications as she was "nearly functioning." (Tr. 232). She also received the results of her muscle biopsy, which were normal. (Tr. 260, 273). She was working part-time and attending school full-time, and was physically active on campus. (Tr. 358, 360). On August 25, 2010, Plaintiff had an appointment with Dr. Maria Chen, M.D. and Dr. Raymond Price, M.D., neurologists at the Hospital of the University of Pennsylvania. (Tr. 357). She had an "exaggerated antalgic gait with astasia abasia on attempts to tandem walk" but was able to walk on her heels and toes. (Tr. 358). Dr. Price opined that Plaintiff "does not have a neuromuscular or neurologic

---

[3] Plaintiff attended five out of eight scheduled physical therapy sessions. (Tr. 204).

disorder. Given that the predominant symptom is pain without much evidence of weakness, I suspect that there may be a psychiatric component to her symptoms." (Tr. 358). On October 25, 2010, Plaintiff followed-up with Dr. Bishwal, who observed that she had tenderpoints of fibromyalgia and prescribed her medication to treat fibromyalgia. Plaintiff's Vitamin D test was low, and Dr. Bishwal wrote that "this may cause fatigue and pain," so he prescribed her Vitamin D. (Tr. 582). Through the end of 2010, Plaintiff continued to exhibit objective symptoms, and returned to her initial dose of Neurontin, but remained in school and working. (Tr. 254, 360, 368, 374).

In early 2011, Plaintiff was discharged from Dr. Friedenberg's care and transferred back to Dr. Kordek. He indicated that Plaintiff "called and is asking for a new prescription for morphine sulfate and an increased dosage as well. She reports that it is becoming less effective when she takes the morphine. She is currently taking 15 mg three times per day." (Tr. 389). Dr. Friedenberg sent a message to Dr. Kordek that stated "as she does not have a neurologic diagnosis I would like to transfer her medication to you. She has done very well with this under a narcotic contract with me." (Tr. 389). Dr. Kordek replied "I will want her to see [Dr. John Findley, M.D., a psychiatrist] because I am afraid of escalating doses, especially if the only diagnosis is fibromyalgia." (Tr. 389).

On April 20, 2011, Plaintiff submitted a function report. (Tr. 126). Plaintiff reported that she could only stand or walk for a few minutes or "on a bad day a few seconds." (Tr. 126). She indicated that she "stay[s] on the couch most of the day" and "if [she] has strength [she] might make some dinner." (Tr. 126). She indicated that she does "laundry or dishes when [she is] up to it." (Tr. 127). She reported that her "husband does most of the housework" and takes care of her pets when she is sick. (Tr. 127). She reported problems dressing, bathing, caring for her hair, shaving, using the toilet, and putting on makeup. (Tr. 127). She explained that she had problems feeding herself and that her husband had to bring her food. (Tr. 127). She reported that she is only able to prepare "lean cuisine or stuff like yogurt that [does not] take much to get ready to eat." (Tr. 128). She explained that she "used to make dinners with several courses" but was unable to do so anymore. She reported that she folds laundry once every other week, but has to have her husband take the laundry down to the washing machine and bring the clean laundry to her because she is unable to carry it. (Tr. 128). She reported that she was able to go to church once a week and "tr[ies] to go to school twice a week if she is steady enough." (Tr. 129). She reported that she was able to go grocery shopping "twice a month at most." (Tr. 129). She reported she was able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (Tr. 129). She reported

that she was too weak to stand, talk, or use her hands for a long period of time and that her medications affect her concentration and memory. (Tr. 130).

On April 23, 2011, Plaintiff's father submitted a report that indicated he charged Plaintiff less rent because "(1) she is [his] daughter (2) she helps to oversee and manage the other five apartments that are close to hers." (Tr. 100).

However, in the spring of 2011, Plaintiff began to experience new and increasingly severe symptoms.  On February 25, 2011, Plaintiff saw Dr. Bishwal for "further follow up evaluation of fibromyalgia." (Tr. 661). She reported pain in all of her joints that the pain in her hands is worse when typing or writing notes. (Tr. 661). She had tender points of fibromyalgia but no swollen or tender joints to suggest rheumatoid arthritis. (Tr. 662). He scheduled additional tests. (Tr. 662).

On April 6, 2011, Plaintiff had a consultation at pain management with Dr. Ankur Shah, M.D. (Tr. 675). He indicated that "I am not sure this is entirely fibromyalgia." (Tr. 675). Plaintiff had slightly diminished sensation on her left upper and lower extremities and tenderness on palpation. (Tr. 678). She was scheduled for epidural injections and Dr. Ankur advised that she continue pilates, lose weight, do aquatherapy, and try a TENS unit. (Tr. 675). She had an injection at the pain clinic on April 21, 2011, and reported new symptoms, including numbness in her feet. (Tr. 686). She also had tenderness on palpation and slightly decreased sensation in her right lower extremity. (Tr. 688).

On May 3, 2011, Plaintiff was evaluated by rheumatologist Dr. Steffan Schulz, M.D. (Tr. 838).[4]  Plaintiff had no swelling, normal range of motion, normal muscle strength and tone, normal sensation, normal reflexes, and a normal gait. (Tr. 838-39). She reported that her arms were more fatigued and tired and that her pain was concentrated in her legs. (Tr. 838). She reported pain in hands with writing and that she gets numbness and tingling after walking distances. (Tr. 838). Dr. Schulz indicated that her symptoms were not "classic for fibro[myalgia]" because they were focused in her legs and lower back and that he "would like to re-consider some CTDs [connective tissue disease] in the differential before focusing on fibro." (Tr. 840-41). He noted that she had abnormal hematology labs to be revisited. (Tr. 841). Tests that day indicated an elevated ESR, elevated "UA Specific Gravity," abnormal "UA Protein," "UA Leukocyte Esterase," "UA RBC," "UA WBC," bacteria, and mucus. (Tr. 851-52).He assessed  muscle weakness, joint pain, back pain, and "other and unspecified nonspecific immunological findings." (Tr. 841). He prescribed Tylenol with codeine, amitripyline, celebrex, levothyoxine sodium, and vitamin D. (Tr. 842).

Plaintiff had additional symptoms and new objective findings through the summer of 2011. On May 20, 2011, she had muscle spasms during her pain

---

[4] Dr. Schulz is an associate professor of clinical medicine in the Rheumatology Division at the University of Pennsylvania. (Tr. 886).

management visit. (Tr. 703). By May 27, 2011, she was reporting new symptoms, with joint pain in her hands, wrists, knees, and ankles. (Tr. 719). At a follow-up with Dr. Schulz on July 1, 2011, she had pain and swelling in her arms, ankles, and MCP and reported dropping things. (Tr. 832-33). She had elevated "gamma globulin" and "beta." (Tr. 834). Dr. Schulz explained that she had "joint and muscle pain of unknown etiology mixed with neurologic symptoms like weakness and burning pains." (Tr. 834). He explained that there was "[a]lthough I have scant evidence on clinical exam, I am suspicious she has some immune system activation-the ESR and the gamma globulin were elevated and her hand pain sounds like a tendinopathy. In addition, she responded much more briskly to NSAIDs than most [patients] with PFS usually do and this makes me look harder for an immune system cause." (Tr. 834). He continued "[t]he ACE is negative but this hardly rules out sacroid-perhaps form pulmonary imaging may be necessary to do this-I don't see much evidence for RA or SLE either. However her hand pain is pretty profound—may have some MCP and PIP swelling…will proceed by checking an MRI of the hand looking for synovitis or tendon swelling." (Tr. 835). She had additional abnormal hematology and diagnostic tests on July 5, 2011, with an abnormally elevated sedimentation rate. (Tr. 848).  She also had abnormal glucose and ALT levels. (Tr. 848). She had low RBC, HGB, HCT, and Mono% and high Neut%. (Tr. 847).

By August 17, 2011, the pain had spread to Plaintiff's elbows and shoulders, and she reported increased pain throughout. For the first time, she exhibited symptoms of Raynaud's disease, as her finger "turns white." (Tr. 827). She had swelling in her MCP but her physical examination was otherwise normal. (Tr. 827). Dr. Schulz explained that he was "still struggling to define her condition but she does have some elevated LFTs, light ESR elevation." (Tr. 829). He ordered a bone scan, added a muscle relaxant (Flexeril) to Plaintiff's medications, and discontinued her injections. (Tr. 829). The same day, she had an abnormal bone scan that showed a pattern of uptake indicating inflammation, specifically "focus of radiotracer uptake in the left distal femoral diaphysis" and "bilateral tibial tuberosities, apophysistis being in the differential diagnosis."[5] (Tr. 869). Follow-up bone scans and X-rays of her left femur revealed lesions, calcifications, and potentially bone cancer. Specifically, they indicated "abnormal uptake in left distal femoral diaphysis" with "evidence of a focal lesion with calcifications within it in the distal femur…consistent with an endochondroma." (Tr. 867).   X-rays of Plaintiff's left knee indicated that the bone scan "showed intensity left distal femur

---

[5] "A bone scan is a diagnostic procedure used to evaluate abnormalities involving bones and joints. In preparation for a bone scan, a radioactive substance is injected intravenously into the patient. The substance passes through the body and eventually enters the bones. A camera then scans the body. Radiation from the substance is detected and produces an image. Regions that appear brighter on the image are called areas of increased uptake and indicate a relatively higher concentration of the radioactive substance, which many mean an abnormal condition." White v. Zubres, 222 S.W.3d 272, 273 (Mo. 2007).  "Bone scans are particularly helpful in diagnosing aspects of" cancer, fractures, and inflammation. 2 Attorneys Medical Advisor § 17:86.

and proximal tibia" and, consistent with the bone scans, indicated a "focal area in the distal femur" with "appear[s] to have some floculant calcifications within it suggesting an endochondroma." (Tr. 868). The report also indicated that "low-grade chondrosarcoma[6] cannot be entirely excluded, especially if there is pain in this area." (Tr. 868). On October 4, 2011, an MRI of Plaintiff's femur indicated a lesion consistent with "a low grade chondroid lesion/chondroma." (Tr. 863).

Plaintiff had additional abnormal tests in November and December of 2011. On November 2, 2011, Plaintiff's sedimentation rate was abnormally high. (Tr. 846). Plaintiff had an abnormal CBC differential test, with low hemoglobin and hematocrit. (Tr. 845). Plaintiff also had low bilitrubin. (Tr. 845). Plaintiff also had an abnormal urinalysis, with high "specific gravity." (Tr. 844). On December 29, 2011, Plaintiff had an abnormal urinalysis, "CBC/Diff" test and myoglobin test.. (Tr. 853, 855). The urinalysis showed abnormal "UA Protein" and "UA PH." (Tr. 853). The "CBC/Diff" test showed low "HGB" [hemoglobin] and "HCT" and high "MPV." (Tr. 855). She had low myoglobin. (Tr. 859). Plaintiff also reported in November of 2011 that she was taking her father's pain medication. (Tr. 807).

On February 17, 2012, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 27). She testified that the pain in her hands and legs prevented her from

---

[6] "Sarcoma is the generic label for malignant tumors" of muscles, joints, and other connective tissues. 7 Attorneys Medical Advisor § 62:10. Chondrosarcoma is a cancer that "originates in cartilage tissue and may develop in soft tissue or bone." 7 Attorneys Medical Advisor § 62:15.

driving. (Tr. 31). She testified that she had pain in all of her joints that prevents her from working. (Tr. 33). She testified that her medications cause blurred vision, difficulties processing information, nausea and sleepiness. (Tr. 35). She testified that she could not sit for more than twenty minutes at a time or stand for more than five minutes at a time. (Tr. 36). She explained that pain in her hands prevented her from brushing her teeth as often as she should. (Tr. 38). She testified that her husband had to help her shower and dress, but that she cannot cook, and watches television for most of the day. (Tr. 39). She testified that she cannot write, use utensils, or scroll on a computer as a result of hand pain. (Tr. 48). She explained that her disease began progressing in the spring of 2011, when she had to drop down to part-time at school, and was unable to return for the fall 2011 semester. (Tr. 41). She testified that she was going to see Dr. Schulz at the end of the month, and that he was expecting to add another medication, methotrexate. (Tr. 41).

The ALJ questioned Dr. Schulz's inability to make a definite diagnosis, to which counsel for Plaintiff responded, "if there's such a big problem with—with the diagnosis, maybe a medical advisor would be in order. " (Tr. 44). The ALJ responded, "to tell me that that a specialist from the University of Pennsylvania is not going to tell me?" (Tr. 44). The ALJ also questioned Plaintiff's "negative labs," and Plaintiff's counsel responded that Plaintiff did not have rheumatoid arthritis, but did have "very high sed rate—36, 33." (Tr. 43). The ALJ also

concluded, without medical testimony, that a lack of atrophy was "inconsistent" with her claims that she no longer used her muscles as much. (Tr. 54).

On February 24, 2012, Plaintiff had an office visit with Dr. Schulz. (Tr. 881). Her diagnoses were muscle weakness, joint pain, drug side effects, inflammatory arthritis, and rheumatoid arthritis. (Tr. 881). She was prescribed methotrexate, prednisone, and folic acid, and her cyclobenazprine (Flexeril), Dicyclmone HCl, Trivora, lavthyroxine sodium, nabumetone, and Protonix were continued. (Tr. 882). She was directed to undergo a series of lab tests and to return in two months. (Tr. 883).

On March 23, 2012, Dr. Schulz submitted an opinion letter, writing that:

> [Plaintiff] is demonstrating symptoms of joint pain in several areas of the body that is incapacitating at this time. Diagnosis at this time is of an undifferentiated connective tissue disease. Her labs and serologies show evidence of immune system activation and radiographic studies of the hands have demonstrated distinct joint capsule swelling showing immune system activity in the lining of the joints. However, lab tests to classify the disease have been negative.
>
> The pattern of joint inflammation could be defined as a "seronegative rheumatoid arthritis" but I am using the undifferentiated connective tissue disease diagnosis as she has some additional features and other subtle abnormalities that go beyond typical "RA." I think the UCTD diagnosis is a safer one to use in what can be an early version of immune system dysfunction so we don't hastily label her condition.

(Tr. 886).

On April 13, 2012, the ALJ issued a decision. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 31, 2011,

the application date. (Tr. 12). At step two, the ALJ found that Plaintiff's obesity, fibromyalgia, and undifferentiated connective tissue disease were severe impairments. (Tr. 12). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 14). The ALJ found that Plaintiff had the residual functional capacity to engage in the full range of light work, except that she was limited to no crawling, climbing, or kneeling. (Tr. 14). At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 20). At step five, based on VE testimony, the ALJ found that Plaintiff could perform other work, in positions like a pricer, stock checker, and food preparation. (Tr. 21). Consequently, the ALJ found that she was not disabled and not entitled to benefits. (Tr. 21).

## VI.     Plaintiff Allegations of Error

### A.     Discounting Dr. Schulz's opinion due to lack of objective evidence

The ALJ was not entitled to reject Dr. Schulz's opinion on the ground that it was unsupported by objective evidence, particularly where there was no contradictory medical opinion. First, the ALJ erred in concluding that the opinion was not supported by objective findings or diagnostic tests because the ALJ ignored objective findings and diagnostic tests that supported Dr. Schulz's opinion. Second, the ALJ acknowledged that there were some positive objective findings, but concluded that they were "normal" or "mild." However, no doctor or any individual with medical training concluded that Plaintiff's objective findings,

radiology reports, hematology, or labs were "normal" or "mild." Consequently, in order to characterize the objective evidence as "mild," the ALJ engaged in impermissible lay interpretation of medical evidence. Third, impairments like Plaintiff's, such as fibromyalgia or immune system dysfunction, often manifest without objective findings. Pain itself can be disabling, so an ALJ may not rely on a lack of objective evidence in this circumstance to conclude that Dr. Schulz's opinion was unsupported. Fourth, relying on Plaintiff's subjective claims is only detrimental if those claims are not credible, and the ALJ failed to properly discount Plaintiff's credibility.

The ALJ assigned "little weight" to Dr. Schulz's opinion because he "relied almost exclusively on the claimant's subjective complaints of pain, rather than on any significant objective evidence of record" and because "all opinions rendered as to a claimant's status as 'disabled' [are] clearly reserved to the Commissioner." (Tr. 19). Specifically, the ALJ found that "Dr. Schultz's own records and other evidence of record do not support this opinion…the objective findings for the most part ranged from normal to quite mild and the diagnostic testing of record also fails to support a debilitating condition" and that "Dr. Schulz notes her labs evidence immune activation and radiological studies of her hands have demonstrated joint capsule swelling, yet the majority of other diagnostic tests were normal and his

objective examinations do not evidence any swelling or other adverse objective findings." (Tr. 19).

Plaintiff asserts that "the opinion of the treating physician need not necessarily be supported by objective laboratory findings." (Pl. Brief at 13) (citing Rossi v. Califano, 602 F.2d 55, 58 (3d Cir. 1979); Drummond v. Heckler, 569 F. Supp. 304, 305 (E.D. Pa. 1983); SSR 96-2p). Plaintiff further asserts that the ALJ failed to take into consideration all of the evidence. (Pl. Brief 14) (citing Allen v. Bowen, 881 F.2d 37, 41, 42 (3d Cir. 1989); Wallace v. Secretary, HHS, 722 F.2d 1150 (3d Cir. 1983)).  Specifically, Plaintiff notes that the ALJ mischaracterized Plaintiff's February 24, 2012 visit with Dr. Schulz. (Pl. Brief at 20).

Defendant does not address Plaintiff's contention that a lack of objective evidence is an inappropriate basis for rejecting Dr. Schulz's opinion, and merely reiterates the ALJ's conclusion that objective evidence failed to support the opinion. (Def. Brief at 17).  Defendant contends that it was not consistent with the evidence in the record because  none of the  "various physicians in 2010 into 2011" reported "any adverse physical examination findings." (Def. Brief. 17). Defendant contends that Plaintiff had "no swelling," "normal muscle strength," normal "sensation and gait," normal reflexes and no tremors. (Def. Brief. 18).  Defendant admitted that imaging indicated synovial thickening in September 2011, but contends that imaging of Plaintiff's left femur was "within normal limits." (Def.

Brief at 18).   Defendant also contends that Plaintiff's function report and her father's letter contradict Dr. Schulz's opinion.   (Def. Brief at 19-20). Plaintiff replies that the activities in Plaintiff's function report are sporadic and transitory, and may not be used to find that she is not disabled. (Pl. Reply at 6)(citing <u>Fargnoli v. Halter</u>, 247 F.3d 34 (3rd Cir. 2001); <u>Frankenfield v. Bowen</u>, 861 F.2d 405 (3rd Cir. 1988); and <u>Smith v. Califano</u>, 637 F.2d 968, 971 (3rd Cir. 1981)).

The Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R.  § 416.927(d)(2). 20 C.F.R. §404.1527(c) establishes the factors to be considered by the ALJ when the opinion of a treating physician is not given controlling weight. Under 20 C.F.R. §§404.1527(c)(1) and (2), the opinions of treating physicians are given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians. 20 C.F.R.  §404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship.  20 C.F.R. §404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R.  §404.1527(c)(5) provides  more  weight  to  specialists,  and  20  C.F.R.

§404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

However, a lack of objective evidence, alone is insufficient to reject a treating physician's opinion. "[D]isability may be 'medically determined' for purposes of the Act even when a doctor's opinion is not supported by objective clinical findings." Rossi v. Califano, 602 F.2d 55, 58 (3d Cir. 1979). SSR 96-2p states:

> A finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §404.1527 and §416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight. *Id*.

Id.; cf. 20 C.F.R. § 416.929 ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work (or if you are a child, to function independently, appropriately, and effectively in an age-appropriate manner) solely because the available objective medical evidence does not substantiate your statements."). As Judge Kane recently explained, an ALJ's "statement that there was no clinical basis to support [the physician's] assessment was an impermissible lay interpretation of the medical records," explaining that:

In rejecting the opinion of Dr. McGinley, the administrative law judge stated that Dr. McGinley's assessment was not based on any objective findings suggestive of the limitations asserted by Dr. McGinley. This was an erroneous lay interpretation of the medical records. In fact Dr. McGinley noted several objective findings during the time he treated Maillet, including pain elicited over the left and right paraspinal muscles; decreased muscle strength in the left and right upper leg and hip muscles; limited range of motion with respect to extension, flexion and left lateral bending, left rotation, and right rotation; and positive straight leg raising tests bilaterally.

The administrative law judge stated that Dr. Shahid's entire report appeared to be based on the claimant's subjective allegations and that there was no basis "to conclude the level of limitations that included an inability to bend side to side and the claimant dragging his right leg when it was his left leg that he complained about at the hearing." Tr. 20. The record, however, reveals that Dr. Shahid performed a physical examination, including range of motion testing, which provided objective facts of Maillet's functional abilities.

Maillet v. Colvin, 3:12-CV-01209, 2014 WL 940174 at *13 (M.D. Pa. Mar. 11, 2014); see also Woodard v. Colvin, 3:12-CV-02189, 2014 WL 4793921 at *3 (M.D. Pa. Sept. 25, 2014) (Kane, J.) (Rejecting the ALJ's rational that a physician's opinion was "a rubber stamping of Plaintiff's subjective complaints" where Plaintiff's consultative examination lasted "over an hour" and contained specific findings).

Even when considering objective evidence as a factor, an ALJ may not independently review and interpret medical evidence:

We also note that the ALJ acted improperly in discrediting the opinions of Dr. Scott by finding them contrary to the objective medical evidence contained in the file. By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of

a physician who presents competent evidence. Again, if the ALJ believed
that Dr. Scott's reports were conclusory or unclear, it was incumbent upon
the ALJ to secure additional evidence from another physician.

Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985). Also, an ALJ may not

ignore contradictory, objective evidence. Burnett v. Comm'r of Soc. Sec. Admin.,

220 F.3d 112, 122 (3d Cir. 2000) (remanding where ALJ failed to mention

"contradictory, objective medical evidence," included MRI showing

spondylolisthesis, loss of range of motion, mild limp, and tenderness).

Even if objective evidence, alone, was sufficient, the ALJ here failed to

acknowledge findings that contradicted his claims. On April 8, 2010, Dr.

Friedenberg observed that Plaintiff walked with an antalgic gait. (Tr. 642). During

Plaintiff's June 2010 physical therapy evaluation, she was observed to have

decreased strength, difficulty ambulating, and postural dysfunction. (Tr. 204). At

Plaintiff's July 2010 evaluation in the neurosurgery department prior to her biopsy,

her gait was "extremely antalgic" and she had decreased strength in her neck,

shoulders, and all fourteen tests of her extremities. (Tr. 213). She had an antalgic

gait with astasia abasia in her August 2010 neurology assessment. (Tr. 358). She

had tender points of fibromyalgia at each of her appointments with Dr. Bishwal.

(Tr. 575, 662, 717, 871). On March 7, 2011, Plaintiff was mildly anemic. (Tr. 389).

On April 5, 2011, she was diagnosed with hypothyroidism. (Tr. 397). On April 6

and 21, 2011, Plaintiff had decreased sensation. (Tr. 678, 686). On May 20, 2011,

Plaintiff had muscle spasm. (Tr. 703). Plaintiff's musculoskeletal exam indicated swelling in her MCP on July 1, 2011 (Tr. 832) and August 17, 2011 (Tr. 827). On August 17, 2011, Plaintiff was had symptoms of Raynaud's disease. (Tr. 827).

The ALJ cited to Plaintiff's normal CBC differential test from May of 2010, prior to the relevant period, but failed to acknowledge her abnormal CBC differential tests from July 5, 2011, November 2, 2011 or December 29, 2011, during the relevant period. (Tr. 17, 845, 847, 855, 878). The abnormal CBCs indicated low hemoglobin and hematocrit counts on all three dates. (Tr. 845, 847, 855). The ALJ's failure to cite to these records, while citing Plaintiff's normal CBC differential test from May of 2010, precludes meaningful review because the Court cannot tell if he discounted these tests or "simply ignored them." Burnett, 220 F.3d at 121.

Similarly, the ALJ cited Plaintiff's elevated sedimentation rate from May of 2010, but discounts it because Plaintiff had a contemporaneous urinary tract infection. (Tr. 17). The ALJ did not acknowledge Plaintiff's abnormal studies from May, July and November of 2011, when there was no evidence of a contemporaneous urinary tract infection. (Tr. 17, 846, 848). On May 3, 2011 Plaintiff had an elevated ESR, elevated "UA Specific Gravity," abnormal "UA Protein," "UA Leukocyte Esterase," "UA RBC," "UA WBC," bacteria, and mucus. (Tr. 851-52). On July 5, 2011, Plaintiff again had abnormally elevated ESR. (Tr.

848).   She also had abnormal glucose and ALT levels. (Tr. 848). Dr. Schulz ordered and reviewed each of these studies, and these studies provide objective support for his March 23, 2012 opinion.   The ALJ's failure to mention these studies is particularly egregious because Plaintiff's counsel explicitly pointed out the May and July 2011 sedimentation rate during the hearing.  (Tr. 43).

Even if the ALJ had acknowledged all of the objective evidence, he would not have been entitled to determine that the evidence indicated "normal" or mild results because he has no medical training and cannot interpret medical evidence. The ALJ wrote that bone scans and MRIs of Plaintiff's left knee indicated "low-grade endochondroma" but were "otherwise unremarkable." (Tr. 17). This is not accurate. In fact, they indicated increased uptake in the left knee, findings consistent with endochondroma, and "low-grade *chondrosarcoma*." (Tr. 867-69). Endochondromas are not the same as chondrosarcoma. Endochondromas are benign lesions that can transform into chondrosarcoma, a  malignant cancer.[7]

Similarly, the ALJ characterized Plaintiff's September 2011 ultrasound of her hands as "relatively normal to mild," acknowledging that they showed "synovial thickening of the MCPs bilaterally, but there was no osseous erosions, no tenosynovitis, and normal extensor tendons." (Tr. 17). The ALJ does not

---

[7] "While most endochondromas are benign, they have the potential for malignant change, usually signaled by recent growth or pain." 7 Attorneys Medical Advisor § 62:18. See also supra note 6.

acknowledge that the synovial thickening had occurred in all of the MCP joints, and that it has resulted in a loss of vascular flow. (Tr. 17). Again, the ALJ has no medical training and has no authority to interpret medical imaging. None of the physicians who interpreted these images opined that they were "relatively normal to mild." Dr. Schulz, who does have medical training, relied on these images to support his opinion that Plaintiff's joint pain was incapacitating.

Relying on a lack of objective evidence is particularly inappropriate when fibromyalgia, and other diseases for which there may be a lack of objective evidence, is alleged:

> [M]any courts have determined that a disability case involving a diagnosis of fibromyalgia presents a particular need for a close examination of the evidence due to the nature of the disease. *See Henderson v. Astrue,* 887 F.Supp.2d 617, 636 (W.D.Pa.2012) (citing *Lintz v. Astrue,* Civil Action No. 08–424, 2009 WL 1310646 (W.D.Pa. May 11, 2009)); *see also Perl v. Barnhart,* Civil Action No. 03–4580, 2005 WL 579879 (E.D.Pa. Mar.10, 2005). Some courts have found error where the ALJ relied on the lack of objective evidence in making the determination that the claimant was not disabled. *Id.*"Symptoms associated with fibromyalgia include pain all over, fatigue, disturbed sleep, stiffness, and tenderness occurring at eleven of eighteen focal points."*Lintz,* 2009 WL 1310646, at *7 (citing *Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996)). Particularly because "fibromyalgia patients often manifest normal muscle strength and neurological reactions and have a full range of motion," *Lintz,* 2009 WL 1310646, at *7 (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 244 (6th Cir.2007) (internal quotation omitted)), an ALJ must be cautions in relying on objective findings and undermining subjective ones. Lintz, 2009 WL 1310646, at *8–11; Rogers, 486 F.3d at 244–46.

Watkins v. Colvin, 3:11-CV-1635, 2013 WL 1909550 at *10 (M.D. Pa. May 8, 2013). Although Dr. Schulz discounted Plaintiff's fibromyalgia diagnosis, he

found that she likely suffered from an immune system disorder. He specifically stated that immune system disorders may be present when there is a lack of objective findings on clinical exam. On July 1, 2011, Dr. Schulz wrote that "[a]lthough I have scant evidence on clinical exam, I am suspicious she has some immune system activation-the ESR and the gamma globulin were elevated and her hand pain sounds like a tendinopathy." (Tr. 834).

Neither the ALJ nor Defendant produced any evidence that an absence of physical examination is determinative when pain is caused by an immune disorder. The ALJ and the Defendant placed great emphasis on the fact that Plaintiff did not experience swelling, decreased range of motion, or similar findings on physical exam. This emphasis is misplaced. The relevant Listing explains that:

> Immune system disorders may result in recurrent and unusual infections, or inflammation and dysfunction of the body's own tissues. Immune system disorders can cause a deficit in a single organ or body system that results in extreme (that is, very serious) loss of function. They can also cause lesser degrees of limitations in two or more organs or body systems, and when associated with symptoms or signs, such as severe fatigue, fever, malaise, diffuse musculoskeletal pain, or involuntary weight loss, can also result in extreme limitation.

Listing 14.00(A)(1)(b). Thus, the typical "symptoms or signs" of this type of impairment are often subjective.

The ALJ also failed to properly discredit Plaintiff's credibility. Plaintiff's activities of daily living, as indicated in her function report and medical records prior to May 2011, were not an adequate basis to reject credibility. First, the ALJ

mischaracterized the report. He found that the report indicated Plaintiff could "[p]repare meals, do laundry, go to church, attend school, grocery shop twice per month, focus long enough to pay bills and handle savings and checking accounts ." (Tr. 19). However, Plaintiff reported that she was no longer able to prepare full meals, was only capable of making Lean Cuisine or yogurt for herself, and that her husband generally cooked and brought food to her. (Tr. 126-28). Plaintiff reported she was able to fold laundry, but her husband had to bring the laundry down to the washer and bring it up when it was done because she was unable to carry it. (Id.) She reported that she "tried" to go to school twice a week, but only if she was "steady enough." (Id.). She reported that she was able to grocery shop twice a month "at most." (Id.) She reported significant difficulty sitting, standing, and using her hands. (Tr. 130).

Plaintiff submitted this function report on April 20, 2011. Plaintiff's father submitted his letter on April 21, 2011. Plaintiff's records indicate that she was going to school and working in 2010, but had dropped to part-time by spring of 2011. Plaintiff testified that her condition deteriorated in the summer of 2011 to the point where she was unable to go to school or perform any significant activities by fall of 2011. Plaintiff did not testify until February of 2012 and Dr. Schulz did not author this opinion until March of 2012.

Additionally, none of these activities suggest Plaintiff would be able to work on a sustained basis:

> It is well settled that "disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Wright v. Sullivan,* 900 F.2d 675, 682 (3d Cir.1990) (*quoting Smith v. Califano,* 637 F.2d 968, 971 (3d Cir.1981)). To the contrary, the ability to engage in "sporadic or transitory activity does not disprove disability" and may well indicate merely that the claimant is only partially functional on a periodic basis. *Id.*

Natale v. Comm'r of Soc. Sec., 651 F. Supp. 2d 434, 454 (W.D. Pa. 2009). Her ability to put Lean Cuisine in a microwave, fold laundry, and "handle savings and checking accounts" says nothing about her ability to function or sustain concentration necessary for a work environment.

The ALJ rejected Plaintiff's credibility based on her "conservative treatment," but, again, the ALJ did not base this interpretation of her medical history on any medical expert opinion. The ALJ noted that Plaintiff's treatment "has been routine and conservative" because she "has not required any hospitalizations or surgeries to treat her sever [sic] impairments." However, it is unclear whether Third Circuit precedent allows purportedly conservative treatment, alone, to support an adverse credibility finding:

> The ALJ concluded that although Sykes had "underlying medically determinable impairments that could produce some of the pain and other symptoms alleged, the evidence does not reasonably support the intensity and the frequency asserted." The only explanation offered for this conclusion was that Sykes has only received "conservative treatment" for pain. This explanation is insufficient.

Sykes v. Apfel, 228 F.3d 259, 274 n. 9 (3d Cir. 2000) compare Phillips v. Barnhart, 91 F. App'x 775, 782 (3d Cir. 2004) (The fact that Plaintiff "only required intermittent pain medication and an at-home exercise program," combined with numerous other factors, such as inconsistent testimony, evasiveness about a drug test, and refusal to participate in job placement with the Office of Vocational Rehabilitation, was sufficient to discredit credibility).

An informative case is Shields v. Astrue, 3:CV-07-417, 2008 WL 4186951 (M.D. Pa. Sept. 8, 2008), where the District Court rejected a magistrate judge's recommendation that the Commissioner's denial of disability benefits be affirmed. There, like here, the ALJ rejected Plaintiff's credibility based on her ability to engage in household chores, purported inconsistencies in her testimony, and alleged conservative treatment. The District Court disagreed that Plaintiff's treatment was conservative, explaining that she received:

> [O]ngoing and protracted treatment for her pain, including several sessions of acupuncture, (R. 167-75), an unsuccessful spinal injection, (R. 163), and increasingly strong pain medication, (R. 68, 73, 86, 88, 91, 109, 201-04, 221, 223, 225). And while the ALJ attached significance to the fact that Plaintiff took "pain medication only on an as needed basis," he failed to mention the fact that "as needed" meant use two to three times *each* day of a synthetic morphine (Avinza), Zanaflex, and Vicodin.

Shields, 2008 WL 4186951 at *11. The Court also rejected the Magistrate Judge's recommendation because Plaintiff's testimony was not inconsistent, explaining:

> Though Plaintiff did testify she could perform many daily activities such as cooking, cleaning, and grocery shopping, she consistently maintained that her ability to perform these activities was limited. (R. 63-69; 314-20.) For example, Plaintiff testified she can only perform household tasks for fifteen minutes at a time, (R. 65), that she cannot lift the corners of a mattress to change the bed, (R. 66), that she needs to lean on one elbow on the counter while cooking, (R. 64), and that she cannot take out the trash.(*Id.*) Plaintiff's testimony as to these limitations is consistent with her statements throughout the entirety of these proceedings.

Shields, 2008 WL 4186951 at *11. Here, like the claimant in Shields, Plaintiff's testimony was consistent. Moreover, she undertook a similarly rigorous course of prescription pain medication. As of October 25, 2010, Plaintiff was taking up to twenty-nine pills per day; amitriptyline once a day, Effexor once a day, MS contin three times per day, two pills of Neurontin 600 MG three times per day, Neurontin 300 MG three times per day, Antivert up to three times per day, two tabs of Tylenol every four to six hours as needed, along with Excedrin Migraine "as directed." (Tr. 574). During her visit, Dr. Bishwal added Elavil once per day, and two days later added Vitamin D once per week. (Tr. 575, 577). As of May 27, 2011, Plaintiff had been weaned off of MS contin and Neurontin, but was prescribed lovethyroxine sodium. (Tr. 720).   By July 1, 2011, she was taking Tylenol with codeine every four hours as needed, amitripyline, dicylomine four times per day, trivora, levothyoxine sodium, naproxen twice per day as needed, omeprazole, and vitamin D once per week. (Tr. 842). By August 17, 2011  Dr. Schulz had added Flexeril three times per day, diclofenac sodium twice per day as

needed, and continued her other medications. (Tr. 830). By February 24, 2012, Plaintiff was taking up to seventeen pills a day, as folic acid, methotrexate, nabumetone, and prednisone had been added to her regimen. (Tr. 882). She was also treated with sacroiliac injections and aqua therapy. (Tr. 675, 686).  She has been treated by specialists in multiple fields, including neurology, pain management, and two rheumatologists.

The ALJ noted that Plaintiff had admitted to taking some of her father's pain medication. However, there is no other legitimate reason provided for either the weight assigned to the medical evidence or the credibility finding. Substantial evidence is not viewed in isolation, it is viewed in the context of the record as a whole. Here, this single piece of information--that Plaintiff was taking pain medication from her father--does not provide substantial evidence, alone, to discredit Dr. Schulz's and Plaintiff's claims.

### B.    Discounting Dr. Schulz's opinion as reserved to the Commissioner

Plaintiff also argues that the ALJ erred in concluding that Dr. Schulz's opinion was reserved to the Commissioner. (Pl. Brief at 21) (citing 20 C.F.R.§404.1527(e)). Plaintiff further contends that, even if Dr. Schulz's opinion was reserved to the Commissioner, the ALJ should have recontacted Dr. Schulz for additional information instead of rejecting the only medical opinion evidence in the record. (Pl. Brief at 16) (citing 20 C.F.R. §416.912(e)). Defendant responds that,

because the ALJ found that Dr. Schulz's opinion was "inconsistent" with the evidence, not "incomplete," there was no need to recontact him. However, as discussed above, the ALJ's conclusion that Dr. Schulz's opinion was inconsistent was based on an impermissible lay interpretation of medical evidence. Judge Kane has explained that "SSR 96-5p emphasizes to the adjudicator the importance of making 'every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.'" Ferari v. Astrue, CIV.A. 1:07-CV-01287, 2008 WL 2682507 at *6 (M.D. Pa. July 1, 2008) (Kane, C.J.); see also Driggs v. Astrue, CIV.A. 1:06-CV-2180, 2008 WL 818888 at *3 (M.D. Pa. Mar. 25, 2008) (Kane, C.J.) (rejecting Commissioner's argument that opinion was merely a disfavored "form report."). Here, the ALJ made no effort to recontact the treating physician. In the context of this case, where the ALJ refused to order a consultative exam and instead interpreted the medical evidence himself, he was not entitled to reject Dr. Schulz's opinion on this ground. Cf. Sims v. Apfel, 530 U.S. 103, 111, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000) ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.").[8]

---

[8] The Court does not recommend that the ALJ be required to recontact Dr. Schulz on remand. Plaintiff will have ample opportunity to submit additional evidence from Dr. Schulz to the ALJ and the ALJ will have the opportunity to elicit or identify evidence that actually contradicts his opinion. The Court merely finds that the ALJ's generic contention that Dr. Schulz's opinion was reserved to the Commissioner is insufficient in the context of the other errors in this case and the ALJ's failure to obtain a CE or otherwise develop the record.

## C. The ALJ's Listing assessment

Defendant asserts that Plaintiff did not establish she met a listed impairment because she did not have blood tests that would support the Listing. (Def. Brief at 15). Defendant cites to Plaintiff's May 2010 blood tests to support his contention. (Def. Brief at 16). Defendant also argues that the ALJ was not required to obtain medical expert testimony regarding whether Plaintiff met or equaled a Listing because expert testimony is only required when there is not "adequate medical evidence in the record," and that the record here "contained ample evidence relating to Plaintiff's impairments." (Def. Brief at 16, n.2). However, Defendant, like the ALJ, ignored the abnormal blood tests from the relevant period. Consequently, the Court recommends that no finding with regard to Listing 14.06 be entered, as further development of the record is necessary.

## VII.    Conclusion

Here, no reasonable mind might accept the relevant evidence as adequate to discredit Dr. Schulz's opinion and conclude that, despite his opinion, Plaintiff could perform work in the national economy. Accordingly, the undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's

social security disability insurance and supplemental security income benefits be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.  The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: November 21, 2014             _____s/Gerald  B.  Cohn_____
                                     GERALD B. COHN
                                     UNITED STATES MAGISTRATE JUDGE